**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTINE BOARDMAN and TERRI BARNETT,** | ) ) ) | |
| **Plaintiffs,** | ) ) ) | **No. 18 C 2728** |
| **v.** | ) ) | **Judge Rebecca R. Pallmeyer** |
| **SERVICE EMPLOYEES INTERNATIONAL UNION a/k/a SEIU, SERVICE EMPLOYEES INTERNATIONAL UNION NO. 73 a/k/a SEIU LOCAL 73, MARY KAY HENRY, Individually and as President of SEIU, and ELISEO MEDINA and DIAN PALMER, Individually And as Co-Trustees of SEIU LOCAL 73,** | ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In August 2016, the Service Employees International Union ("SEIU") imposed an emergency trusteeship on Local 73, a subordinate union affiliated with SEIU, purportedly to address a breakdown in governance at the Local. When SEIU, led by President Mary Kay Henry, imposed that trusteeship, Plaintiffs Christine Boardman and Terri Barnett were removed from their elected positions at the Local. This lawsuit followed. Boardman and Barnett allege that Henry and the other Defendants appointed the trustee not for the reasons Henry stated in her order—to address governance issues at the Local—but instead to retaliate against Plaintiffs for speech protected under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 461 *et seq*. According to Plaintiffs, Henry was angry with Boardman for speaking out against her and SEIU on various occasions between 2010 and 2015.

In moving for summary judgment, Defendants contend that so long as the trustee was imposed for a single permissible reason, Plaintiffs' claims fail even if Plaintiffs could show Defendants also appointed the trustee out of animus. As explained below, the court agrees that

Plaintiffs have not created a dispute of fact about the existence of at least one permissible purpose for the trusteeship, meaning that Defendants are entitled to summary judgment.

## BACKGROUND

SEIU is an international labor union that represents workers in "health care, public services, and property-related services in the United States and Canada." (Defs.' Statement of Material Facts (hereinafter "DSOF") [87] ¶ 2.) Local 73, an SEIU affiliate, represents members throughout Illinois and Northwest Indiana.[1] (*Id.* ¶ 3.) Local 73 has about 30,000 members and is one of the largest unions affiliated with SEIU. (Pls.' Statement of Additional Facts (hereinafter "PSOAF") [94] ¶ 80; Defs.' Resp. to Pls.' Statement of Additional Facts (hereinafter "DSOFR") [98] ¶ 80.) Local 73 is governed by an approximately 100-member Executive Board. (PSOAF ¶ 83.)

Defendant Mary Kay Henry, the International President of SEIU, won her first election in May 2010 and was reelected in 2012, 2016, and 2020. (DSOF ¶ 4.) Plaintiff Christine Boardman was elected president of Local 73 in November of 2000 and held that position until SEIU imposed the trusteeship on August 3, 2016. (DSOF ¶ 6; PSOAF ¶ 80; DSOFR ¶ 80.) Boardman was also elected as a member of the International SEIU Executive Board ("IEB")—SEIU's highest governing body—in either 2001 or 2002. (*See* DSOF ¶¶ 6–7; PSOAF ¶ 82.) Boardman was continuously reelected to the IEB and held that position until January 18, 2018. (PSOAF ¶ 82.) Plaintiff Terri Barnett was first employed by Local 73 in 1993. (DSOF ¶ 8.) She served as its Vice President from August 7, 2015, to August 3, 2016. (*Id.*)

## I.     Boardman's Relationship with Henry

Plaintiffs identify several events between 2010 and 2016 that, they allege, led Henry to dislike Boardman. The dispositive question here is not whether there was bad blood between the

---

[1]     To avoid confusion, when this opinion refers to Local 73—which is itself an SEIU union—the opinion will include the words "Local" or "Local 73." Any mention of "SEIU" without the word "local" refers only to the international organization.

parties, but whether SEIU had a valid reason for the imposing the trusteeship. The court will nevertheless review the circumstances in at least some detail.

### A.    Boardman Supports Henry's Opponent in Her Race for SEIU President

In 2010, Andy Stern, SEIU's then-President, announced that he was stepping down. (DSOF ¶ 5.)  Two members of the SEIU Executive Board—Mary Kay Henry and Anna Berger—sought to succeed him.  (DSOF ¶ 5; Pls.' Boardman Dep., Ex. F to PSOAF (hereinafter "Pls.' Boardman Dep.") [94-2] at 14:11–17.)[2]  When a president steps down before the end of their term, the IEB elects an interim president to fill the role until a regular vote can be taken at the next international convention. (Pls.' Boardman Dep. at 14:1–15:13.)  Boardman, who was on the IEB and had a vote, supported Berger over Henry.  (PSOAF ¶ 84.)  Boardman testified that she communicated her support for Berger to several people, but not directly to Henry. (Pls.' Boardman Dep. at 16:9–17:17.)  Boardman also said that Henry's supporters talked to Boardman about changing her vote.  (Id. at 16:21–24.)  Henry testified that she did not learn about Boardman's support for Berger until after the election, at some point in 2010 or 2011.  (Defs.' Second Henry Dep. Excerpts, Ex. RRR to DSOFR (hereinafter "Defs.' Second Henry Dep.") [98-1] at 93:19–94:15.)

Defendants note that the relationship between the two was sufficiently repaired that Boardman, in 2012 and 2016, accepted Henry's invitation to join her election slate for the IEB. (DSOF ¶ 74.)

---

[2]    Both parties include multiple exhibits within each individual attachment to their Local Rule 56 filings.  For ease of reference, when the court cites to a specific page within an exhibit, the court refers to the page number of the attachment itself, rather than the page number of the exhibit.  For example, the citation to the Boardman deposition here is to the fourteenth page of [94-2], rather than the fourteenth page of this deposition transcript.  The only exception to this practice is for documents that contain enumerated paragraphs; there, the court cites to the specific paragraph number in the exhibit.

**B.      Boardman Attempts to Obtain Financial Assistance from SEIU**

When Boardman was first elected president of Local 73 in 2000, the Local had a budget deficit of $1.4 million.  (PSOAF ¶ 81.)  Beginning in 2010, Boardman began requesting financial assistance from SEIU.  (Pls.' Boardman Dep. at 27:7–14.)  There is no evidence that she made this request directly to Henry.  According to Boardman, Local 73 "did not get a penny" from SEIU, even though it "routinely" gave "millions of dollars" to other locals.  (*Id.* at 27:11, 28:13–18.)  Boardman admitted, however, that she has no first-hand knowledge of what other locals received, because "[t]hat is a carefully held secret," and she would "have to look at one of their financial summaries to really figure out who got any money and who didn't."  (*Id.* at 29:1–4.)  Henry testified that when Boardman held "organizing drives," Local 73, "like many, many locals" received "financial support from the International Union."[3]  (Defs.' Second Henry Dep. at 95:8–20.)

**C.      Boardman Attempts to Organize the Illinois Nurses Association**

Boardman testified that, in 2012, "2000 nurses in the Illinois Nurses Association"—"an entirely independent union"—"wanted to join Local 73."  (Pls.' Boardman Dep. at 18:24–19:5.)  Boardman met with the Association and "proposed" to Henry that they "become part of Local 73."  (*Id.* at 19:6–14.)  Boardman testified that Henry told her she could "go ahead," but soon afterward, Boardman learned that SEIU had already made an agreement with another union, the California Nurses Association, which gave that union the exclusive right to organize nurses in the Midwest.  (*Id.* at 18:13–23, 20:9–21:7; PSOAF ¶ 86.)  Boardman stated that she told Henry that SEIU was "making a big mistake."  (Pls.' Boardman Dep. at 22:2–4.)  Boardman also told Henry she was upset with her regarding the situation, but "it's not like there were raised voices or anything."  (*Id.* at 21:8–13, 22:8–9.)

---

[3]      Neither party has offered actual financial records to support their claims.  (*See* PSOAF ¶ 88 (citing Boardman deposition testimony regarding lack of financial assistance); DSOFR ¶ 88 (disputing same and citing Henry deposition testimony).)

### D. Boardman Seeks to Organize Federally Qualified Health Corporation Workers

In early 2014, Local 73 began competing with another SEIU-affiliated union to organize health clinic workers at Federally Qualified Health Corporation ("FQHC") facilities in Cook County, Illinois. ("Doyle Report, Ex. JJJ to DSOFR [98-1] at 32.) Pursuant to the SEIU Constitution and Bylaws, the IEB appointed a hearing officer to decide which local had jurisdiction and ultimately adopted his recommendation that both locals pause their attempts to organize the clinic. (*Id.* at 40–41; DSOFR ¶ 87.)

Boardman found this "pretty upsetting" because "every other public union was allowed to have jurisdiction over FQHC" clinics in their region. (Pls.' Boardman Dep. at 23:9–24.) Boardman believed it was a "phony hearing," and in an email to Henry and other SEIU officials, Boardman criticized the hearing officer. (*Id.* at 24:1; Boardman Email on FQHC Organizing, Ex. P to PSOAF (hereinafter "Boardman FQHC Email") [94-3] at 53.) Boardman wrote that "the rules that [SEIU] ha[d] set for this organizing" were "ridiculous" and that the decision "only supports what most staff believe—that [Local 73] will never get a fair shake from the International." (Boardman FQHC Email at 53.) Boardman also said the decision showed her staff that they "are the 'step-children' of the International Union." (*Id.*)

### E. Boardman Opposes SEIU's Endorsement of Hillary Clinton

In 2015, after a "robust debate," SEIU endorsed Hillary Clinton in the Democratic primary, an endorsement that Henry supported. (Defs.' First Henry Dep. Excerpts, Ex. G to DSOF (hereinafter "Defs.' First Henry Dep.") [87-1] at 52:5–17.) Boardman wanted SEIU to endorse Bernie Sanders instead.[4] (PSOAF ¶ 85; DSOFR ¶ 85.) Boardman was not at the IEB meeting when the endorsement decision was made, and she did not communicate with Henry about it, but

---

[4] Defendants point out that Boardman's preference for Sanders was not unique to her. Leaders of other SEIU locals either vocally opposed the decision to endorse either candidate, or affirmatively lobbied for Sanders, but those other locals were not the subject of a trusteeship. (DSOF ¶ 72.)

she did (at an unspecified time) convey her preference for Sanders in a phone call with Eileen Kirlin, an SEIU Executive Vice President. (Pls.' Boardman Dep. at 58:4–17.) Boardman does not know whether Kirlin told Henry. (*Id.* at 60:3–12.) Henry testified that she did not learn that Boardman favored Sanders until preparing for her deposition in this case. (Defs.' First Henry Dep. at 52:18–53:1.)

## II.     Tension Develops Between Brandon and Boardman

In April 2015, Matthew Brandon was elected Secretary Treasurer for Local 73. (Apr. 24, 2015 Local 73 Meeting Minutes, Ex. YY to DSOF [87-3] at 105.) During an August 2015 meeting of the Local Executive Board, Brandon opposed Boardman's recommendation that Terri Barnett fill a vacant vice president position. (DSOF ¶ 42.) Brandon opposed appointing any vice president, given Local 73's budget deficit.[5] (Aug. 7, 2015 Meeting Minutes, Ex. Z to DSOF (hereinafter "Aug. 7, 2015 Minutes") [87-1] at 309.) A vote was called, and Barnett was elected by a two-vote margin. (DSOF ¶ 42; Aug. 7, 2015 Minutes at 309.)

Two days later, Brandon emailed several SEIU officials, including Henry, and stated that "[r]ecent decisions by President Christine Boardman have placed the viability of SEIU Local 73 in serious danger." (Brandon Aug. 10, 2015 Email, Ex. EE to DSOF [87-2] at 35.) Brandon said that "President Boardman ha[s] assured that Local 73 will end fiscal year 2015 with a deficit of more than $500,000." (*Id.*) Brandon also stated that he was "now working in a hostile environment" and wanted to ensure that the SEIU officials knew that he "openly opposed and will continue to oppose recent decisions by this president." (*Id.*)

Less than a week later, Brandon sent another email to Henry in which he decried "the crisis of leadership here at Local 73." (Brandon Aug. 14, 2015 Email, Ex. FF to DSOF [87-2] at 37.) Brandon claimed that Boardman had fired Wayne Lindwall, Local 73's City of Chicago

---

[5]     According to the meeting minutes, vice presidents at the Local made "$75 thousand a year." (Aug. 7, 2015 Minutes at 307.) While the record does not reflect Barnett's salary prior to her promotion to vice president, the minutes note that the "difference in salary" was "about $22-30 thousand a year." (*Id.* at 309.)

Division Director, in "retaliation" for not being "loyal to her." (*Id.*) Lindwall's act of disloyalty, Brandon believed, was his vote "not to fill the vacant Vice-President's position in an attempt to limit the budget deficit."[6] (*Id.*) Brandon feared that he too would face retaliation because he was the one "informing the membership about [Local 73's] deficit." (*Id.*) Brandon said that his wife, Karen Webster-Brandon, "received a call of warning from a staffer" who said that Boardman was thinking about firing her from her job as Chief of Staff of Local 73. (*Id.*; DSOF ¶ 25.) Brandon said he was "sure Boardman will fire Karen but it won't be for performance, it's personal towards me." (Brandon Aug. 14, 2015 Email at 37.)

Four days later, Henry appointed Ed Burke and Jeffrey Howard to serve as "Personal Representatives to SEIU Local 73 to gather facts regarding current developments and concerns that ha[d] been brought to [her] attention at the local and to assist Local 73's leaders with carrying out the local's priorities and commitments." (Aug. 18, 2015 Henry Representatives, Ex. K to DSOF [87-1] at 118.) Soon after Burke and Howard arrived at the Local, a group of members began demanding that Lindwall be reinstated. Boardman testified that during an Executive Board meeting on an unspecified date, several unnamed members "just burst in." (Defs.' First Boardman Dep., Ex. J to DSOF (hereinafter "Defs.' First Boardman Dep.") [87-1] at 94:23–95:7; *see* PSOAF ¶ 94.) Boardman said that they were armed.[7] (Defs.' First Boardman Dep. at 94:12–95:7.) Specifically, Boardman testified that these were "armed people from the City of Chicago unit" that she thought were "mainly aviation police, but they also could've been from one of our other bargaining units." (Defs.' First Boardman Dep. at 94:12–97:24.)

---

[6]       Plaintiffs claim that Boardman fired Lindwall because Lindwall sent an anonymous email to several members of Local 73 in which he allegedly defamed several people, including by characterizing Boardman "as someone who has a problem with alcohol and . . . fall[s] down drunk." (PSOAF ¶ 43; Pls.' Boardman Dep., Ex. F to PSOAF [94-2] at 30:15–24, 42:21–43:15.)

[7]       Boardman did not explain at her deposition how she knew the intruders were armed and does not claim they brandished their weapons, so the court assumes that their weapons were holstered at their sides.

Barnett, who was also at the meeting, called it "a horrible moment." (Barnett Dep., Ex. Y to DSOF (hereinafter "Barnett Dep.") [87-1] at 297:9–15.) As Barnett recalls, she was at the "meeting trying to get work done and all of a sudden [she] hear[d] this chanting and pounding on the doors." (*Id.* at 297:16–18.) She and other staff went out to the hallway and foyer and found several people "screaming and shouting" about bringing Lindwall back. (*Id.* at 297:19–21.) Barnett knew "some of these folks [were] cops," some were "security," and some were "tough guys packing," (*i.e.*, had "a gun on them"). (*Id.* at 297:22–298:4.) Barnett said the "staff were so shook, so scared, and rightfully they should have been because this was so destructive." (*Id.* at 298:7–9.) Barnett explained that Boardman "talk[ed] with them, tr[ied] to calm them down, and then they finally left," which ended "a very scary situation." (*Id.* at 298:9–12.) Boardman testified that, afterward, Henry's personal representatives told her that if she "want[ed] peace," she should rehire Lindwall because Brandon was "very concerned about that." (Defs.' First Boardman Dep. at 98:1–3.) Boardman "did what they asked" and rehired Lindwall. (*Id.* at 98:4; DSOF ¶ 45.)

On October 20, 2015, Henry appointed a third personal representative to "investigate current developments and concerns" and "assist with a financial review of Local 73's books and records by an outside auditing firm." (Oct. 20, 2015 Henry Representative, Ex. II to DSOF [87-2] at 47.) On December 1, that auditing firm sent a letter to Henry identifying "potential areas of concern," including inadequate documentation of reimbursements and improper control over the use of personal credit cards for union expenses. (Dec. 2015 Letter and Audit Report, Ex. L to DSOF [87-1] at 124–29.) Later that month, Boardman and Brandon went to Washington, D.C. to meet with Kirlin and SEIU Secretary-Treasurer Michael Fishman to discuss those concerns. (*See id.* at 121.) On January 8, 2016, Fishman and Kirlin sent a letter to Boardman and Brandon noting the "significant work to be done to stabilize Local 73's finances." (*Id.*) The letter also "flagged several issues that [they] believe further threaten the stability of Local 73, and therefore should be addressed immediately." (*Id.* at 122.) The letter continued:

> Going forward, it is our hope that disagreements and disputes between you as leaders of the local can be handled in a manner that fosters unity among our members and among Local 73 staff. In addition we remain concerned that the very high concentration of friends/family members employed by Local 73 creates a destructive dynamic, as well as the appearance of favoritism and nepotism.

(*Id.*) Fishman and Kirlin concluded by conveying that:

> It is our firm belief . . . that Local 73 must make systematic, prospective change in all of the policy and practice areas outlined by the auditors to be in a position to continue the kind of programmatic work that is more important than ever as [SEIU] face[s] Supreme Court decisions . . . that are attempting to undercut the power of working people by stripping them of powerful, high-functioning local unions.

(*Id.* at 123.)

### III. Boardman Announces Her Planned Retirement

When the Local 73 Executive Board met on January 22, 2016, Boardman "addressed the retirements coming up," and said she would also be "leaving in June when she gets her pension in order." (Jan. 22, 2016 Local 73 Meeting Minutes, Ex. ZZ to DSOF (hereinafter "Jan. 22, 2016 Executive Minutes") [87-3] at 109.) Boardman testified that, at that meeting, she notified the Executive Board that she planned to retire that year, "upon receipt of [her] birth certificate."[8] (Defs.' First Boardman Dep. at 91:1–4, 91:16–19.) A few days later, Boardman told the Local's general membership that she would be retiring, who then voted for Brandon to become the next president (until an election could be held). (Jan. 26, 2016 Local 73 Meeting Minutes, Ex. AAA to DSOF (hereinafter "Jan. 26, 2016 General Minutes") [87-3] at 113; *see* Boardman First Set of Charges, Ex. N to DSOF (hereinafter "Boardman First Set of Charges") [87-1] at 139.)

On March 30, 2016, Boardman announced to the Illinois AFL-CIO executive board—on which Local 73 had a seat (Boardman First Set of Charges at 139)—that she was planning to retire in June and that Brandon would thereafter become president of Local 73. (Defs.' First Boardman Dep. at 93:7–12; DSOF ¶ 21.) In April, Boardman and Brandon agreed to a "Plan

---

[8] Boardman averred that she was waiting to obtain a copy of the certificate from England, where she was born, and that the certificate "was a pre-requisite to [her] ability to apply for and receive retirement benefits." (Boardman Decl., Ex. A to PSOAF [94-1] at 3, ¶ 6.) Boardman states that, as of July 2016, she had still not received that copy. (*Id.*)

Going Forward," in which Boardman's current status was listed as "President" and under "Projected Status," the plan said "Matt as President." (Plan Going Forward, Ex. JJ to DSOF [87-2] at 49.)[9] That same month, Local 73 held a retirement party for Boardman and two other members of the Local. (DSOF ¶ 22.)

## IV. Boardman Terminates Webster-Brandon and Terminates Lindwall a Second Time

On April 29, 2016, Howard wrote a letter to Henry stating that Boardman, Brandon, "and staff of Local 73 have been cooperative through [his] time at the Local."[10] (Howard Apr. 29, 2016 Letter, Ex. W to DSOF [87-1] at 278.) Howard wrote "that Local 73 has addressed, or has a plan to address, each of the issues raised by SEIU officers," and that, accordingly, he "believe[d] that the work [Henry] asked [him] to do is concluding." (*Id.*) His letter included a list of issues that the Local had addressed or had agreed to address by a particular date. (*Id.*)

Soon after Howard left, Boardman sought to terminate the employment of two Local staff members, each of whom were close to Brandon: Wayne Lindwall and Karen Webster-Brandon (Brandon's wife). On an unspecified date, Boardman terminated Lindwall for a second time for reasons the parties do not discuss. (*See* DSOF ¶ 51; PSOAF ¶ 51.)

On June 1, 2016, Boardman announced that Webster-Brandon would be laid off from her staff position. (DSOF ¶ 52.) Neither party explains this decision. On June 13, Webster-Brandon filed a charge with SEIU against Boardman, alleging, among other things, that Boardman had "retaliated against [her] and removed [her] from her position . . . using the 'so-called' budget deficit as a pretext to implement a layoff." (Webster-Brandon Charge, Ex. O to DSOF [87-1] at 150.) Webster-Brandon stated that Boardman "did not layoff less senior, probationary employees," and

---

[9] It is not clear from the record who drafted the "Plan Going Forward." Its stated purpose was to "wall off" officers and staff from family members employed at the Local. The proposed organization would keep Brandon from having supervisory or salary authority over his wife. (*See* Plan Going Forward at 49–52.)

[10] Henry had appointed Ed Burke along with Howard to serve as a personal representative. In his letter, Howard noted that Burke had since retired. (Howard Apr. 29, 2016 Letter, Ex. W to DSOF [87-1] at 278.)

that Boardman had "operated the Local under a budget deficit year-after-year perhaps more than a decade without implementing layoffs." (*Id.*)

## V.    Boardman Files Her First Set of Charges Against Brandon

On July 1, 2016, Boardman filed several disciplinary charges against Brandon and asked Henry and the International Union to "assume original jurisdiction"—in other words, adjudicate the charges—under the SEIU Constitution and Bylaws. (DSOF ¶ 25; Boardman First Set of Charges at 145.) That same day, citing her charges, Boardman suspended Brandon from his position as Secretary Treasurer of Local 73 for thirty days and prohibited him from entering the Local 73 office. (*Id.* ¶ 26.) Two weeks later, Henry assumed jurisdiction over Boardman's charges. (July 14, 2016, SEIU Assumption of Jurisdiction, Ex. I to DSOF [87-1] at 74; PSOAF ¶ 98.)

Boardman charged Brandon with eight counts, which alleged the following:

- Brandon had "cultivated personal ties" with then-mayor of Chicago, Rahm Emanuel, "to the detriment of the Local" by providing an affidavit supporting the city in a case against municipal pension funds. (Boardman First Set of Charges at 135–36.) Boardman stated that "Brandon's close association with the Emanuel administration and his willingness to serve its interests at the expense of [Local 73] members has taken a severe toll on the reputation of Local 73 among other unions in Illinois." (*Id.*)

- Brandon obstructed an internal investigation into defamatory emails that several Local 73 members received from an anonymous sender.[11] (*Id.* at 136–37.) Some of those former members sued the Local, claiming that it was failing to investigate the matter. (*Id.* at 137.) Boardman alleged that Brandon, without her authorization, emailed the Local's outside counsel and claimed to have "spoken to Christine [Boardman] about the investigation" and that it was "the position of Local 73 that this matter is concluded based on the findings of [the counsel's] investigation." (*Id.*) In fact, Boardman said, Brandon had not discussed the matter with her, and by halting the investigation, Brandon "aggravated the situation and impeded any settlement of the lawsuit against the Local." (*Id.*)

- Brandon, while the Secretary Treasurer of the Local, "sought to 'represent'" a member of the "staff union of Local 73, Service Employees Staff Union (hereinafter 'SESU') . . . who had been laid off" and who was the subject of "an unfair labor practice . . . charge against Local 73" that was brought by SESU. (*Id.* at 138.)

---

[11]    Boardman noted in this count that she later determined the author of the emails was Brandon's ally, Wayne Lindwall, who Boardman had fired. (*See* Boardman First Set of Charges at 137; Pls.' Boardman Dep. at 30:15–24, 42:21–43:15.)

- Brandon contrived to have himself appointed as the Local 73 representative on the Executive Board of the Illinois State AFL-CIO although the Local's Constitution and Bylaws gave Boardman, as president, the exclusive power to appoint Local 73 members to that Board. (*Id.* at 138–39.)

- Brandon was hostile toward a newly hired organizer, Andrew Yale. Boardman alleged that Brandon had written an angry email to the Director of Organizing in which Brandon referred to Yale as a "proven liar." (*Id.* at 139–40.)

- Brandon "sought to bring a 'grievance' against the Local" on behalf of Lindwall, who had "been terminated for his role in regard to the anonymous emails" noted above. (*Id.*)

- Brandon "explicitly denied in vulgar and insulting terms that the President of the local has the authority to direct his work" and at times "assumed a paranoid and even threatening tone." (*Id.* at 139–41.)

- Brandon "had knowledge" of the circulation of "an anonymous leaflet" that was falsely critical of Boardman and other Local 73 staff. (*Id.* at 144.)

In addition to these counts, the court notes Plaintiffs' claim that "[i]n or about June 2016 President Boardman learned of actions being taken by Matthew Brandon to ratify a contract he had secretly negotiated with Unit II of the City of Chicago that would have allowed him to take [a] unit, associated with SEIU Local 73, to another organization," a practice known as "disaffiliation." (*See* PSOAF ¶ 95.) Plaintiffs cite Boardman's deposition and her first set of charges for that claim. But Boardman did not discuss any concerns about disaffiliation in those charges, and her deposition testimony is inconsistent. (*Compare* Pls.' Boardman Dep. at 40:13–16 ("Yeah, you can be president, but you're not going to try to disaffiliate all these different locals from the overall local union") *with id.* at 33:3–15 (testifying that, in January 2016, Boardman "believed that Matt was not going to try to disaffiliate the local union.").) Boardman's purported concerns about disaffiliation are not well supported by the evidence Plaintiffs cite and, in addition, it does not appear that any such concern was communicated to SEIU (or otherwise played a role in the trusteeship decision).

VI.    **Tensions Erupt at a July 15, 2016 Local 73 Meeting and Boardman Files a Second Set of Charges Against Brandon**

Local 73 held an Executive Board meeting on July 15, 2016.  (DSOF ¶ 27.)  Boardman arranged for off-duty police officers to attend because she believed Brandon would challenge her authority to run the meeting, she knew that Brandon had supporters on the Board, and she thought there was a risk of violence.  (*Id.* ¶ 28.)  Brandon arrived and sat at the table behind the podium, and, asserting that he was the rightful president of Local 73 because Boardman had retired, attempted to run the meeting.  (*Id.* ¶ 29.)  Boardman responded that she was still the president, that Brandon was out of order, and that Brandon did not have a right to sit at the head table because Boardman had suspended him from office.  (*Id.* ¶ 30.)

The parties agree that Boardman accurately detailed what happened at the July 15 meeting in a supplementary charge against Brandon (Count IX) that she filed with SEIU a week later.[12]  (*See* PSOAF ¶¶ 31–36; Boardman Second Set of Charges, Ex. R to DSOF (hereinafter "Boardman Second Set of Charges") [87-1] at 160.)  In that charge, Boardman stated that Brandon "attempted to seize control of Local 73 in what can only be described as a coup d'etat." (Boardman Second Set of Charges at 161.)  Boardman asked those in attendance who were not invited or were not members of the Executive Board—like Lindwall, who had been fired from the Local several weeks earlier—to leave the meeting, but Brandon told Lindwall that he could stay. (*Id.* at 162.)  Boardman concluded that "[a]t that point there was no way to have Lindwall removed without violence possibly erupting," as "Lindwall is an auxiliary policeman" and "is authorized to carry a gun, which he is known to habitually do."  (*Id.*)  And while there were off-duty police present, Boardman stated that "any attempt to use them to remove disruptive individuals would only have provoked greater disorder and perhaps violence."  (*Id.* at 163.)

---

[12]    Henry formally assumed jurisdiction over Boardman's amended charge on August 29, 2016.  (Aug. 29, 2016 SEIU Assumption of Jurisdiction, Ex. TT to DSOF [87-3] at 12.)

Boardman said that she "attempted to start the meeting but was prevented from doing so by what appeared to be a coordinated effort by a group of about 10–12 supporters of Brandon who began to stand up one by one and shout various things," including criticism of Boardman and assertions that she should leave and let Brandon take over. (*Id.* at 162.) Boardman stated that despite "repeated attempts to bring order," the "disruption went on for more than half an hour without any business being conducted." (*Id.* at 162–63.) Boardman stated that "there appeared to be no other reasonable course available but to end the effort to conduct business and adjourn the meeting," but while "[m]any people [then] left the meeting hall . . . Brandon's supporters remained." (*Id.* at 163–64.) Boardman stated that "[b]y that point the off-duty police officers . . . became concerned enough to call in reinforcements and several on-duty officers appeared in the lobby." (*Id.* at 164.) Shortly thereafter, the meeting room "emptied without incident." (*Id.*)

Notes and testimony from Christine Bondi—then the Local 73 Recording Secretary—align with Boardman's account. Bondi's notes confirm that several people were yelling and that it was "very confusing" as "people [were] talking all over the place." (Bondi July 15, 2016 Notes, Ex. P to DSOF (hereinafter "Bondi July 15, 2016 Notes") [87-1] at 152.) Bondi later testified before SEIU officials that the meeting "dissolved into utter chaos." (Tr. of SEIU Emergency Trusteeship Hearing on September 24, 2016, Ex. NN to DSOF (hereinafter "Emergency Trusteeship Hearing Tr.") [87-2] at 68; *see id.* (repeating that it was "very chaotic, very chaotic").) Bondi stated that "there w[ere] people yelling and screaming so much, no one—there was no control of the meeting." (*Id.*)

Despite Boardman's and Bondi's earlier accounts, Plaintiffs now "dispute that the meeting was utter chaos," and argue that the "loud verbal disagreements . . . were limited to just a few persons of the nearly 75 persons present."[13] (PSOAF ¶ 30.) Plaintiffs also state that there

---

[13] While Plaintiffs add additional color to Boardman's initial description of what happened at the meeting, they do not dispute that Boardman arranged for the off-duty officers to

was "no violence or altercation."  (*Id.*)  Plaintiffs submit the declaration of Taalib-Din Ziyad—then a Vice President of Local 73 who attended the July 15 meeting—who stated that of the "60 to 70 people" at the meeting, only five or six "were verbally disruptive."  (Ziyad Decl., Ex. C to PSOAF [94-1] ¶¶ 3, 5–6.)  Ziyad also stated that "[w]hile the meeting was contentious, [he] did not see any physical threats or physical violence, nor did [he] believe the meeting affected the operations of the local union."  (*Id.* ¶ 6.)

A general membership meeting was scheduled for the following day, July 16, 2016. Though she now disputes that the July 15 meeting was "chaotic," in her second set of charges, Boardman wrote that she was "[a]pprehensive that Brandon's supporters would employ similar disruptive tactics," that the supporters "would prevent any business from being conducted," and that "violence might erupt."  (Boardman Second Set of Charges at 164.)  Accordingly, Boardman and "the entire Executive staff of the Local" agreed to postpone the meeting.  (*Id.*)  Boardman and several staff members showed up at the meeting site before the scheduled start time to inform any members who had missed the notifications that the meeting had been postponed.  (*Id.*)  But half an hour before the scheduled start, Brandon and Webster-Brandon arrived; Brandon entered the meeting hall while Webster-Brandon "stayed outside . . . and tried to persuade members to go in."  (*Id.*)  Around "40 or 50 people" ultimately attended the meeting led by Brandon.  (*Id.*)  Vice President Terri Barnett and Assistant Division Director Brenda Woodall went inside to see what was going on, but quickly left after Brandon and Webster-Brandon "told them to get out."  (*Id.*)

## VII.    SEIU Imposes an Emergency Trustee at Local 73

The 2016 SEIU Constitution and Bylaws were in force at all times relevant to this lawsuit. (DSOF ¶ 9.)  Article VIII sets forth the "Duties and Powers" of the International President.  (Ex.

---

attend the meeting "because she knew that Brandon might challenge her authority" and that "the meeting could turn violent."  (PSOAF ¶ 28.)  Plaintiffs also admit Defendants' statement that the off-duty officers became "concerned enough to call in reinforcements."  (*Id.* ¶ 34.)

QQ to DSOF (hereinafter "SEIU Constitution and Bylaws") [87-2] at 117.)  One such duty and power is the ability to impose a trusteeship to take control of a local union:

> Whenever the International President has reason to believe that, in order to protect the interests of the membership, it is necessary to appoint a Trustee for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of this International Union, he or she may appoint such Trustee to take charge and control of the affairs of a Local Union or of an affiliated body and such appointment shall have the effect of removing the officers of the Local Union or affiliated body.

(*Id.* at 119.)  Ordinarily, "[i]n order to ensure that no trusteeship is imposed without an adequate right to be heard," the International President must appoint a hearing officer and issue notice of the hearing "prior to the imposition of a trusteeship."  (*Id.* at 120.)  But "where in the judgment of the International President an emergency situation exists . . . a Trustee may be appointed prior to a hearing."  (*Id.*)  In that situation, the International Executive Board must appoint an officer to conduct a hearing "within 30 days after imposition of the trusteeship," and the Board must make a decision "within 60 days after the appointment of such Trustee," though the time limits may be extended for "good cause."  (*Id.*)

If a trusteeship is imposed, the trustee is "authorized and empowered to take full charge of the affairs of the Local Union."  (*Id.* at 119.)  The trustee may "remove any of [the union's] employees," appoint employees, and "take such other action as in his or her judgment is necessary for the preservation of the Local Union."  (*Id.*)  The trustee is "subject to the supervision and direction" of the International President and must "report on the affairs/transactions" of the trusteeship to her.  (*Id.*)

On July 18, 2016—after the failed Local 73 meetings but several days before Boardman filed her second set of charges—Michelle Healy, the director of SEIU's Public Services Division, wrote a memorandum to Heather Conroy, the SEIU Executive Vice President, with the subject line: "SEIU Local 73—Contingency Trusteeship Planning."  (July 18, 2016 Mem. from Michelle Healy to Heather Conroy, Ex. KK to DSOF [87-2] at 54.)  Healy wrote:

As you know, SEIU Local 73 has a long history of leadership conflicts and internal problems. On at least two occasions in the recent past, the International President has appointed personal representatives at the local to assist the local with meeting its internal needs and to provide guidance on leadership and financial issues due to internal strife.

I understand that matters at the local are quickly deteriorating. On July 1, 2016, Local 73 President Christine Boardman filed comprehensive internal charges against Local 73 Secretary-Treasurer Matt Brandon, and Secretary-Treasurer Brandon has countered with complaints against President Boardman. In addition, we are confirming reports of a breakdown in governance at the local over the weekend when, because of the leadership conflict, the local was unable to conduct normal business at a scheduled Executive Board meeting on Friday and had to cancel a membership meeting on Saturday.

In light of grave concerns about the potential adverse impact of the chaos at the local on the members, employer relationships, local union finances, and the local's ability to properly carry out its collective bargaining responsibilities, I understand you want me to assist in contingency planning for a possible trusteeship of Local 73, working in close consultation with the SEIU Legal Department. Together, we will assemble the necessary staff team to assess whether it is appropriate to recommend to the International President an emergency trusteeship at the local and the next steps to be taken.

(*Id.*)

On July 26, 2016, Brandon sent an email to several SEIU officers, including Heather Conroy, listing what he perceived to be "the ongoing blatant and willful violations of the SEIU Local 73 Constitution and By-Laws . . . by retired former President Christine Boardman." (Brandon July 26, 2016 Email, Ex. LL to DSOF (hereinafter "Brandon July 26, 2016 Email") [87-2] at 56.) Brandon wrote that "[t]hese violations and illegalities are being effectuated and enforced by the use of armed guards hired by former [President] Boardman to deny [his] right to assume The Office of President of Local 73 as approved by both the Executive Board and membership of Local 73." (*Id.*)

On August 1, Deedee Fitzpatrick, the Deputy Chief of Staff, wrote a memorandum to Henry concerning "the issues which call for an emergency trusteeship" of Local 73. (Aug. 1, 2016 Mem. from Deedee Fitzpatrick to Mary Kay Henry, Ex. H to DSOF (hereinafter "Aug. 1, 2016 Fitzpatrick Mem.") [87-1] at 70.) Fitzpatrick noted the "serious breakdown in the internal democratic governance structure at Local 73" following the "recent dramatic escalation of infighting among

17

its top officers." (*Id.*) Fitzpatrick specifically discussed the internal charges filed by Boardman against Brandon, Boardman's decision to suspend Brandon for 30 days, Brandon's refusal to abide by that suspension, and the July 15 Local board meeting that "erupted in dissension" and "had to be abruptly terminated, with armed security guards and police being called into the situation." (*Id.* at 71.) Fitzpatrick stated that members were "left to wonder who is in charge of the local or authorized to act as its agent[ ]," noting, for example, "a recent ratification vote on a tentative contract negotiated by Brother Brandon [that] was unilaterally cancelled by Sister Boardman."

Fitzpatrick recommended that Henry "order an emergency trusteeship of the Local on August 3, before the situation worsens."[14] (*Id.* at 70.) Fitzpatrick stated that she had "no confidence that any measure short of an emergency trusteeship of this local would restore the stability that is needed," and that "[i]t is impractical to wait for resolution of the outstanding internal charges which continue to proliferate and which must be conducted in accordance with the due process protections required under our constitution and federal law." (*Id.* at 71.) In her declaration, Fitzpatrick also stated that individual disciplinary proceedings "would take too long to complete" and that "there was a risk that the disciplinary process would distract Boardman and Brandon from the operation of the local." (Fitzpatrick Decl., Ex. B to DSOF (hereinafter "Fitzpatrick Decl.") [87-1] at 16–17.)[15]

On August 3, 2016, pursuant to the SEIU Constitution and Bylaws, Henry imposed an emergency trusteeship over Local 73. (DSOF ¶ 13.) According to Henry's trusteeship order, she "determined that an emergency situation exists within SEIU Local 73," requiring the appointment

---

[14]    Brandon's suspension from his position at Local 73 was set to expire on August 3, 2016. (DSOF ¶ 39.)

[15]    As Plaintiffs point out, Boardman avers that, between July 15, 2016, and August 3, 2015, she was never contacted by Henry, Fitzpatrick, "or anyone else from the International to inquire into the events of July 15, 2016 or the plans of the local going forward." (Boardman Decl., Ex. A to PSOAF [94-1] ¶ 10.) The relevance of this statement is unclear. In her charges against Brandon, Boardman had already explained her version of events in detail.

of a trustee to "assure the performance of the Local's collective bargaining responsibilities, restore democratic procedures at the Local, and otherwise carry out the legitimate objects of the Local and International Unions." (Henry Aug. 3, 2016 Trusteeship Order, Ex. SS to DSOF (hereinafter "Henry Aug. 3, 2016 Order") [87-3] at 6.) Henry specifically noted the "[i]ncessant in-fighting between the top governing officers of Local 73, President Christine Boardman and Secretary-Treasurer Matthew Brandon," which had "intensified in recent months" and had "escalated to the point that the Local can no longer maintain even the semblance of proper democratic procedures." (*Id.*) Henry also stated that the conflict between Boardman and Brandon was "impeding the Local's ability to carry out its basic governance functions, such as conducting Executive Board and general membership meetings." (*Id.*)

When she was deposed in this case, Henry did not remember whether she had ever imposed an emergency trusteeship on any local other than Local 73. (*See* Pls.' Henry Dep., Ex. E to PSOAF (hereinafter "Pls.' Henry Dep.") [94-1] at 28:4–30:24.) Unlike a regular trusteeship—which Henry recalled imposing several times—an emergency trustee is installed prior to a hearing. (*Id.*) For example, Henry recalled a February 2015 trusteeship imposed on Local 617 in Newark, New Jersey for issues "related to financial mismanagement of the union's funds, leadership instability because the president got pulled by the mayor to become a deputy mayor with very little notice, and . . . very unstable enforcement of contracts." (*Id.* at 30:2–16.) Henry did not recall at the time whether that was an emergency trusteeship (*id.* at 30:7–8), but Defendants have submitted evidence that it was: a declaration from Alma Henderson, an Associate General Counsel at SEIU. (Henderson Decl., Ex. EEE to DSOFR (hereinafter "Henderson Decl.") [98-1] ¶¶ 3, 6.) Henderson also averred that SEIU imposed three emergency trusteeships on locals after August 3, 2016. (*Id.* ¶ 7.)

Henry testified that she relied on Fitzpatrick's recommendation when she decided to impose an emergency trusteeship. (Defs.' First Henry Dep. at 55:12–14.) Fitzpatrick averred that, when she recommended a trustee, she knew neither who Boardman had supported in the

2010 SEIU presidential election nor that Boardman had opposed SEIU's endorsement of Hillary Clinton. (Fitzpatrick Decl. ¶ 40.) Fitzpatrick said she only learned about these matters after this lawsuit was filed. (*Id.*) Fitzpatrick also averred that she "did not consider, nor was [she] motivated by" Boardman's unsuccessful effort to affiliate the Illinois Nurses Association with Local 73. (*Id.* ¶ 41.)

Henry asserts that she established the trusteeship only for the reasons articulated in her August 3, 2016 order. (Henry Decl., Ex. C to DSOF (hereinafter "Henry Decl.") [87-1] ¶ 14.) Henry specifically stated that she was not motivated by Boardman's opposition to her candidacy for president in 2010, Boardman's attempt to affiliate the Illinois Nurses Association, Boardman's efforts to obtain additional financial support for Local 73, or Boardman's opposition to SEIU's decision to endorse Hillary Clinton—which Henry said she did not learn about until this lawsuit was filed. (*Id.* ¶¶ 16–18.)

## VIII.  SEIU Removes and Terminates Boardman and Brandon

On the morning of August 3, Trustee Eliseo Medina and others from SEIU took possession of the Local 73 offices and notified Local staff, general members, and Executive Board members that a trusteeship had been imposed. (DSOF ¶ 53.) Under Article VIII § 7(a) of the SEIU Constitution, all Local 73 officers were automatically removed from their officer positions. (DSOF ¶ 54.) Medina then terminated the employment of both Brandon and Boardman, who was thus barred from entering her office. (*Id.* ¶ 55; Boardman Decl. ¶ 3). The trustee "retained as employees of the local union" the other former officers who were removed from their elected positions when he was appointed. (PSOAF ¶ 114.)

The parties disagree about Henry's level of involvement in Boardman's and Brandon's terminations. Plaintiffs note that, according to Article VIII § 7(b) of the SEIU Constitution, the trustee reports to Henry. (*See* SEIU Constitution and Bylaws at 119.) Boardman also testified that Fitzpatrick, Henry's Chief of Staff, personally (and apparently on behalf of Henry) "told

[Boardman] that [SEIU was] terminating [her] salary, [her] insurance benefits, and everything else." (Pls.' Boardman Dep. at 48:11–16.)

Defendants contend that Boardman's termination was primarily Medina's prerogative. Henry averred that, generally, she "do[es] not play a role in deciding which local union staff employees to retain and which to dismiss" once she appoints a trustee, instead deferring to the trustee's decisions. (Henry Decl. ¶ 25.) Medina testified that he called Boardman on the morning of August 3 and told her that "the local had been placed in trusteeship," that he was the trustee, and that Boardman "had been removed from office." (Medina Dep., Ex. SSS to DSOFR [98-1] at 106:20–107:7.) Medina averred that he "decided not to retain Boardman and Brandon . . . because retaining either or both officers would threaten to continue the ongoing power struggle that had been undermining the local." (Medina Decl., Ex. D to DSOF (hereinafter "Medina Decl.") [87-1] ¶ 5.)

Medina also stated that he was "not aware of any local union officers of that rank who had been retained on staff after a trusteeship had been imposed for reasons relating to the internal operations of the local." (*Id.*) In fact, during (and even before) Henry's presidency, no president was retained in a local after a trustee was appointed to address operational issues. (DSOF ¶ 56.)

## IX. SEIU Holds Hearings on the Trusteeship and Brandon's Discipline

Under Article VIII § 7(f) of the SEIU Constitution, "no trusteeship [may be] imposed without an adequate right to be heard or without other appropriate safeguards." (SEIU Constitution and Bylaws at 120.) Thus, on August 31, 2016, Gerald Hudson, the SEIU Secretary-Treasurer, sent notice to members of Local 73 about a hearing set for September 24. (Notice of Trusteeship Hearing, Ex. MM to DSOF (hereinafter "Notice of Trusteeship Hearing") [87-2] at 59, 63.) The Rules of Procedure, distributed along with the notice, provide that the Executive Board of the Local could elect, by majority vote, to be an official party at the hearing, which would have allowed a Board spokesperson to present evidence and cross-examine witnesses. (DSOF ¶¶ 57–58; Notice of Trusteeship Hearing at 60–63.) The Board did not hold a vote and thus did not have

official party status; Trustee Medina was the only official party in the proceeding. (DSOF ¶ 58; Report and Recommendation of Hearing Officer Edgar Romney on Trusteeship of Local 73, Ex. OO to DSOF (hereinafter "Trusteeship Hearing Report") [87-2] at 76.)

The August 31 notice also discussed why the hearing was not being held within 30 days, as required (absent "good cause") under Article VIII, Section 7(f) of the SEIU Constitution. It stated that Henry had

> determined that good cause existed to hold the hearing on September 24, 2016— more than 30 days after the imposition of the trusteeship over Local 73—in light of Local 73's pending commitments and Labor Day holiday conflicts affecting the individuals whose attendance at the emergency trusteeship hearing is necessary and to maximize the opportunity for members [to] participate in the hearing after the summer holidays. The International President also determined that good cause existed for the International Executive Board's decision on the trusteeship to be made more than 60 days after the trusteeship was imposed.

(Notice of Trusteeship Hearing at 60; *see* PSOAF ¶ 111.)

On September 24, 2016, Hearing Officer Edgar Romney held a hearing in Chicago. (DSOF ¶ 59.) Twenty-eight Local members spoke on the record. (Trusteeship Hearing Report at 77.) Boardman and Brandon were each given thirty minutes to make statements; Romney also heard testimony from the trusteeship team and former Local officers. (DSOF ¶ 59.) In addition to her oral statement, Boardman submitted for the record her hearing presentation in written form, as well as other documents. (*See* Trusteeship Hearing Tr., Ex. UUU to DSOFR [98-1] at 127:20– 27; Boardman's Hearing Exs., Ex. WWW to DSOFR (hereinafter "Boardman's Hearing Exs.") [98-1] at 146–173.) Boardman's written presentation stated that she "object[ed] to the way the process has unfolded," particularly the delay by SEIU in taking jurisdiction over the charge she filed against Brandon, as well as the imposition of an emergency trusteeship before conducting a hearing. (Boardman's Hearing Exs. at 146.) Because she was not a party, Boardman was not permitted to cross-examine witnesses. (PSOAF ¶ 112.)

After the hearing, Romney issued a written report in which he found "that the emergency trusteeship imposed on Local 73 was warranted" in light of "multiple proper purposes" for its imposition.  (Trusteeship Hearing Report at 90.)  First, Romney highlighted

> the deeply dysfunctional relationship between Sister Boardman and Brother Brandon and the chronic breakdowns in union governance in the local, as evidenced by Sister Boardman and Brother Brandon's competing claims to Local 73's presidency; dueling sets of internal charges that led to Sister Boardman's suspension of Brother Brandon from his former position as local Secretary-Treasurer; and the local's inability to conduct even routine union business, such as the July 15, 2016, Executive Board meeting, which erupted into chaos and resulted in the Chicago police being called, and the July 16, 2016, Membership meeting, which had to be cancelled because of the internal conflict.

(*Id.*)  Romney also noted that the Local had failed "to adopt and implement adequate internal financial controls" and that a high number of collective bargaining agreement contracts with the Local had not yet been finalized.  (*Id.* at 90–91.)

On November 10, 2016, Hearing Officer Yvonne Walker held a hearing on the disciplinary charges filed by Boardman, Brandon, and Webster-Brandon.  (DSOF ¶ 64; Report and Recommendation of Hearing Officer Yvonne Walker on Disciplinary Charges, Ex. UU to DSOF (hereinafter "Disciplinary Hearing Report") [87-3] at 24.)  Walker ultimately found Brandon guilty of multiple violations, including serious misconduct and conduct unbecoming a member.  (DSOF ¶ 65.)  She recommended that Brandon be barred from membership in any SEIU local for his lifetime, and Henry accepted that recommendation.  (*Id.*)[16]

On January 22, 2017, the IEB adopted and ratified Romney's recommendations.  (PSOAF ¶ 110; DSOF ¶ 63.)  In a letter to Henry on January 30, Boardman stated that she "did not receive any notice" of that meeting, which Boardman said she was entitled to attend as a member of the IEB.  (Boardman Jan. 30, 2017 Letter, Ex. H to PSOAF (hereinafter "Boardman Jan. 30, 2017 Letter") [94-3] at 28.)  In her deposition testimony, however, Boardman said that she received IEB

---

[16]     Walker recommended that all other charges "be dismissed because they have either been withdrawn or are lacking in evidence or merit."  (Disciplinary Hearing Report at 49.)  The parties do not say, but the court presumes that Henry accepted that recommendation as well.

meeting notices until June 2017, though she never specifically admitted to receiving notice of the January meeting.  (Defs.' Third Boardman Dep., Ex. PPP to DSOFR [98-1] at 80:2–11.)

In her letter, Boardman also claimed that she had "a right to appeal the decision endorsed by Edgar Romney, [Henry] and [her] executive officers, general vice-presidents, and the rest of the International Executive Board."  (Boardman Jan. 30, 2017 Letter at 28.)  She called on Henry to "call a special meeting of the IEB" so Boardman could "present [her] case."  (*Id.*)  Boardman said she "ha[d] this right under Article VIII Section 1(h) [of the SEIU Constitution] and Article VIII Section 2 as well as Article XI Section 2 and 3."  (*Id.*)  She has not identified the source of such an appeal right, however, and the court is aware of none.[17]

## X.    SEIU Terminates Barnett

On June 26, 2017, Denise Poloyac and Dian Palmer, then serving as Co-Trustees of Local 73, terminated Barnett from her staff employment.  (DSOF ¶¶ 8, 66.)  As a result, Barnett lost her membership in the Local because she was neither employed within its jurisdiction, nor employed by the Local itself.  (*Id.* ¶ 69.)  Palmer averred that the termination was "due to [Barnett's] poor work performance" and that Palmer "did not consider any relationship or affiliation that Barnett may have had with Christine Boardman when making the decision."  (Palmer Decl., Ex. E to DSOF (hereinafter "Palmer Decl.") [87-1] ¶ 18.)  Barnett testified that she believed her employment was terminated because she was "Boardman's friend" and "wasn't an ally enough to [the trustees]."

---

[17]    Article VIII, Section 1(h) states that the International President has the authority to "interpret this Constitution and Bylaws and decide on all points of law submitted to him or her" (SEIU Constitution and Bylaws at 118), but the IEB's ratification of Romney's report was not a "point of law" submitted to Henry.  Section 2 of Article VIII covers petitions of actions by a "Local Union" (*Id.* at 118-19), but the IEB is not a local union.  Article XI, Section 2 only gives appeals rights to "Local Union[s]," which Boardman is not.  (*Id.* at 122.)  Finally, Article XI, Section 3 gives the IEB the power to "act upon and decide all appeals" but does not itself confer power on Boardman to appeal a ratification decision of the IEB.  (*Id.*; *see id.* (describing Section 3 as governing the "[r]ight to decide appeals").)  Henderson averred that Section 3 "has never been interpreted as permitting a union member to appeal to the IEB where the appeal is from one of the IEB's own decisions."  (Henderson Decl. ¶ 18.)

(Pls.' Barnett Dep., Ex. G to PSOAF [94-3] at 13:10–13.) Neither Henry nor Medina was consulted about Barnett's termination and neither played any role in her termination. (DSOF ¶ 67.)

After her termination, Barnett filed charges and complaints with the Illinois Department of Human Rights, the National Labor Relations Board, and SEIU. (*Id.* ¶ 68.) The court is unaware of the outcome of those charges. In its earlier ruling, this court dismissed Barnett's challenge to the termination of her staff employment. *See Boardman v. Serv. Emps. Int'l Union*, 441 F. Supp. 3d 655, 676–77 (N.D. Ill. 2020). Barnett's only remaining claim relates to the loss of her union officer position, which is discussed below.

## XI. Boardman Becomes Ineligible for the Local 73 Retired Members Club and the IEB

In September 2017, Boardman attended a meeting of the Local 73 Retired Members Club and attempted to pay dues as a retired member. (DSOF ¶ 75; Palmer Decl. ¶ 11; *see* Pls.' Boardman Dep. at 55:7–56:12.) Palmer averred that she "promptly returned [Boardman's] tender of dues because Boardman was not eligible for membership in the Retired Members Committee." (Palmer Decl. ¶ 11.) Palmer determined that, because Boardman "had not retired from her employment at Local 73" but rather "had been removed from her employment with the imposition of the trusteeship," she was not a retiree. (*Id.* ¶ 12; *see* Medina Decl. ¶ 8.) Plaintiffs cite no contrary evidence. Plaintiffs instead cite Boardman's testimony in which she said she was initially "welcomed by everybody" at the retiree member meeting, but was later told she was "just too much of a distraction" and would "become a disturbance in the meeting." (Pls.' Boardman Dep. at 56:7–57:8.)

In early 2018, Boardman was asked to resign from the IEB because she was no longer a member in a local and so was ineligible to serve on that body. (DSOF ¶ 77; Fitzpatrick Decl. ¶ 45; Henry Jan. 18, 2018 Letter, Ex. CCC to DSOF [87-3] at 139.) Boardman declined to step down, prompting SEIU to formally remove her. (DSOF ¶ 77.) While Plaintiffs attempt to dispute that membership in a local union was technically a prerequisite to serve on the IEB, Boardman admitted as much at her deposition and Plaintiffs admitted the relevant Statement of Fact in

Defendants' submission.  (*See* Defs.' First Boardman Dep. at 82:9–83:1; PSOAF ¶ 7 (admitting that "[t]o serve as a member of the IEB, which is the highest governing body of SEIU, one must be a member of a local union affiliated with SEIU or employed by SEIU").)

## XII.    Boardman Is Arrested at the Local 73 Offices

On February 13, 2019, Boardman showed up at the Local 73 offices and began distributing leaflets to Local 73 members.  (PSOAF ¶ 115.)  The leaflets, entitled "Local 73 Members Are Losing Rights in Their Union," included a note at the bottom that stated, "Christine Boardman, Former President . . . Illegally Removed from Office," which was followed by Boardman's phone number and personal email address.  (Boardman Leaflet, Ex. O to PSOAF [94-3] at 51.) Boardman's leaflet warned of "[n]ew Local 73 By-Laws" that would soon come into effect and would make it so that "only delegates can speak and vote."  (*Id.*)  Boardman's leaflet asserted that the changes meant ordinary Local 73 members would be unable to raise objections, vote on any dues increases, vote on by-law changes, or nominate members for office.  (*Id.*)  It stated further: "How delegates are chosen is not clear in the new by-laws," but "with the International, it will all be a show."  (*Id.*)

Boardman understood that Local 73 no longer considered her a member, given that her employment was terminated in conjunction with the trusteeship; she also knew that Local 73 had the right to exclude nonmembers from the premises.  (Pls.' Boardman Dep. at 52:3–20.) Boardman nevertheless believed that she had a right to attend the meeting, and when Local 73 members asked her to leave, she refused.  (*Id.* at 52:21–54:7.)  At some point, two officers from the Chicago Police Department showed up; it is unclear who called them to the scene.  (*See id.* at 54:8–17; Roan Dep., Ex. TTT to DSOFR [98-1] at 115:10–17; DSOFR ¶ 115.)  Boardman testified that the officers asked her to leave the premises—which she refused to do—and that, shortly thereafter, the officers arrested her.  (Defs.' Second Boardman Dep., Ex. OOO to DSOFR [98-1] at 68:15–69:14.)  The evidence does not reveal whether Boardman was ultimately charged with a crime and, if so, what came of any such charges.

## DISCUSSION

### I.    Procedural History

SEIU's decision to impose an emergency trustee at Local 73 has generated substantial litigation.  Boardman first filed this case in April 2018.  (*See* Compl. [1].)  It was originally assigned to Judge St. Eve, but on motion of the defendants in *Hunter v. Service Employees International Union*—an earlier case brought by Local 73 members also disputing the propriety of the 2016 trusteeship—the court found this case related within the meaning of Local Rule 40.4 and accepted reassignment.  *See* No. 18-cv-986, 2019 WL 1294697, at *4 n.9 (N.D. Ill. Mar. 21, 2019).  After Defendants moved to dismiss her initial complaint, Boardman filed an amended complaint in July 2018, at which time Barnett joined as an additional plaintiff [29].  Defendants again moved to dismiss [30].  Several months later, the court dismissed the claims in *Hunter* for lack of subject matter jurisdiction.  *See* 2019 WL 1294697, at *1.

Plaintiffs then filed the operative Second Amended Complaint at issue here, asserting eight counts under the LMRDA.  (*See* Second Am. Compl. [42].)  Counts Three and Six allege that the trusteeship imposed by SEIU was improper under Title III, which governs when and how labor organizations can impose trusteeships on subordinate organizations.  (*See id.* ¶¶ 51–54, 89–92.)  The remaining claims—brought under Title I, which creates a "Bill of Rights" for union members—essentially challenge the consequences to Plaintiffs caused by the trusteeship. Counts One and Four allege that Defendants, by appointing a trustee, removed Plaintiffs from their elected offices and terminated their union membership without due process.  (*Id.* ¶¶ 10–42, 55–77.)  Counts Two and Five allege that Defendants retaliated against Plaintiffs (in the form of the trusteeship) for their speech.  (*Id.* ¶¶ 43–50, 78–88.)  Finally, Counts 7 and 8 arise from the Local's decision to exclude Boardman from a February 2019 meeting and to call the police when she refused to leave.  (*Id.* ¶¶ 93–109.)

Defendants filed a third motion to dismiss, which the court granted in part and denied in part.  *See Boardman*, 441 F. Supp. 3d at 660. The court first held that the Title III claims were not

mooted when the trusteeship ended because the propriety of SEIU's decision had "enduring legal relevance"—in other words, Plaintiffs' Title I claims relied on whether the trusteeship was properly established. *Id.* at 668. And taking the facts alleged as true, the court held that Plaintiffs sufficiently pleaded that Defendants lacked a proper purpose for imposing a trustee, and instead did so solely to retaliate against Plaintiffs' speech. *Id.* at 675. The court accordingly denied Defendants' motion to dismiss the Title III claims and denied Defendants' motion to dismiss many of Plaintiffs' other claims because they derived from the allegedly improper trusteeship. *See id.* at 675 (speech claim based on retaliatory loss of elected office); *id.* at 675–76 (speech claim based on retaliatory loss of union membership); *id.* at 677–78 (speech claim based on exclusion from membership meeting); *id.* at 678–79 (due process claim based on termination of union membership); *id.* at 679 (retaliation claim based on arrest after attempt to enter union meeting).)

The court did, however, grant Defendants' motion to dismiss Barnett's speech-based claim arising from her loss of staff employment because the LMRDA protects union membership, not staff employment status. *Id.* at 676–77. For largely the same reasons, the court dismissed Plaintiffs' claims that they were removed from elected office without due process. *Id.* at 678–79 (holding that the LMRDA does not create due process rights for elected officers, whereas it does protect officer speech, because speech-based retaliation could chill union members' speech).)

The parties then engaged in discovery, and Defendants seek summary judgment on Plaintiffs' remaining claims. (*See* Defs.' Br. in Support of Mot. for Summ. J. ("Defs.' Br.") [86].)

## II.    Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of [any challenged] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018) (quoting Celotex v. Catrett, 477 U.S. 317, 322 (1986)).

While the court may not weigh conflicting evidence or make credibility determinations, the party opposing summary judgment must point to competent, admissible evidence that demonstrates a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). If the non-moving party cannot produce "evidence that would reasonably permit the finder of fact to find in [its] favor on a material question," the court will grant summary judgment. *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quotations marks omitted).

In assessing the evidence at summary judgment, the court considers the facts in the light most favorable to the non-moving party, giving that party "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014). But the non-moving party is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Nor can one avoid summary judgment by showing merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

This court's local rules require a party moving for summary judgment to file a statement of material facts, consisting of "concise numbered paragraphs" supported by citations to "specific evidentiary material." L.R. 56.1(a)(2), (d). The non-movant must file a responsive statement that

admits or disputes each asserted fact. L.R. 56.1(b)(2), (e). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also* L.R. 56.1(e)(3).

## III. Analysis

Defendants primarily argue that Plaintiffs have not adduced evidence that Henry imposed a trusteeship on Local 73 for the sole purpose of retaliating against Plaintiffs. (Defs.' Br. at 8–13.) For the reasons discussed below, the court agrees and grants summary judgment on the Title III claims. And because Plaintiffs' other claims derive from the purportedly improper trusteeship, the court grants summary judgment on those claims, too.

### A. The Undisputed Facts Show That Defendants Had At Least One Non-Retaliatory Motive for Imposing a Trustee.

The key question on the Title III claim is whether Defendants imposed a trustee at Local 73 for the sole purpose of retaliating against Plaintiffs. If they did, or if there is a factual dispute about whether they did, Defendants' motion fails. If they did not—in other words, if Plaintiffs fail to adduce evidence that Defendants' intent was retaliatory or if the facts show Defendants had at least some permissible purpose for imposing a trustee—Defendants are entitled to summary judgment. After reviewing the evidence, the court concludes that, despite Plaintiffs' concerns, Defendants have put forth substantial and undisputed evidence of a proper motive.

Title III of the LMRDA provides that trusteeships established by a union (like SEIU) over a "subordinate body" (like Local 73) must be established "in accordance with the constitution and bylaws of the organization" and "for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreement or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization." *See* 29 U.S.C. § 462. In other words, "one of two defects will invalidate a trusteeship: (1) that it was not established or administered in accordance with the

constitution and bylaws of the union; or (2) that it was not established or administered for one of the enumerated statutory purposes."[18]  *See Morris v. Hoffa*, No. 99-cv-5749, 2001 WL 1231741, at *3 (E.D. Pa. Oct. 12, 2001).

Here, Plaintiffs allege that Defendants appointed a trustee to retaliate against Boardman's protected speech under the LMRDA.  (*See, e.g.*, Second Am. Compl. ¶ 45.)  Importantly, a claim that a trusteeship was retaliatory fails if "there was at least one proper purpose for imposing the trusteeship."  *Morris*, 2001 WL 1231741, at *7, *aff'd* 361 F.3d 177, 188–89 (3d Cir. 2004); *see also Nat'l Ass'n of Letter Carriers v. Sombrotto*, 449 F.2d 915, 923 (2d Cir. 1971) ("[O]ne proper purpose for imposing a trusteeship would suffice"); *Mason Tenders Dist. Council v. Laborers' Int'l Union*, 884 F. Supp. 823, 836 (S.D.N.Y. 1995) ("One legally permissible purpose is all that is required for a valid trusteeship").[19]  In other words, "[a]s long as the trusteeship is supported by at least one proper purpose, it is immaterial that the labor union which imposed the trusteeship also may have had an impermissible motive."  *SEIU, Local No. 87 v. SEIU, Local No. 1877*, 230 F. Supp. 2d 1099, 1105 (N.D. Cal. 2002).

---

[18]     Plaintiffs assert several arguments focused on procedure, but as this court previously noted, their complaint does not allege that Defendants imposed the trustee in a procedurally improper manner.  *See Boardman*, 441 F. Supp. 3d at 670 n.12 (citing Second Am. Compl.).  Instead, as discussed more below, Plaintiffs assert that SEIU's alleged deviations from normal procedure is "evidence of wrongful motive and intent."  (Pls.' Mem. in Opp. to Defs.' Mot. for Summ. J. ("Pls.' Opp.") [93] at 8.)

[19]     Neither party has identified Seventh Circuit precedent directly addressing whether impermissible conduct must be the "sole purpose" for imposing a trustee, nor has the court.  *But see Int'l Bhd. of Boilermakers v. Local Lodge 714*, 845 F.2d 687, 693 (7th Cir. 1988) (concluding that a trusteeship was proper because "financial malpractice was the (*or a*) bona fide purpose of the trusteeship . . . .") (emphasis added).  Several other district courts have, however, applied this "sole purpose" standard, as did this court at the motion to dismiss stage.  *See Boardman*, 441 F. Supp. 3d at 670-71.  In their opposition brief (as at the motion to dismiss stage), Plaintiffs implicitly concede that the sole purpose standard applies by targeting their arguments to it.  (*See, e.g.*, Pls.' Opp. at 4 (asserting that "Defendants' actions evidence a clear intent to emergency trustee SEIU Local 73 for the sole purpose of removing Plaintiff, Christine Boardman, from office and union membership"); *id.* at 9 (arguing that the court may infer that Defendants' proffered reasons for imposing the trustee "are nothing more than pretext"); *id.* (arguing that Defendants' "rush to judgment suggests only one interest").)

Because whether Defendants had a proper purpose for appointing a trustee is dispositive, the court begins with the reasons they gave. In the trusteeship order, Henry stated that she was imposing a trustee to (among other things) "restore democratic procedures at the Local" after "[i]ncessant in-fighting between the top governing officers of Local 73"—Boardman and Brandon. (Henry Aug. 3, 2016 Order at 6.) That in-fighting, according to Henry's order, had "intensified in recent months" and "escalated to the point that the Local can no longer maintain even the semblance of proper democratic procedures." (*Id.*) The order said the conflict between Boardman and Brandon "imped[ed] the Local's ability to carry out its basic governance functions, such as conducting Executive Board and general membership meetings." *Id.* The order cited the events that "unfolded at the Local Union over the last several weeks" and referenced the personal representatives that had been previously assigned to help the Local "manag[e] its leadership problems." *Id.*

But according to Plaintiffs, Henry's order was merely pretext for the real reason she wanted to impose a trustee on Local 73: to punish Boardman for her past speech. Plaintiffs argue that Boardman—by supporting Henry's opponent in the 2010 SEIU elections, attempting to organize a group of nurses against Henry's wishes, and opposing Henry's efforts to endorse Hillary Clinton over Bernie Sanders in the Democratic primary—created a "pattern of dissent" that Henry sought to punish. (Pls.' Opp. at 11–12; *see also* Background § I, *supra*.) Defendants, of course, vigorously contest both the facts and the logic of Plaintiffs' positions. (Defs.' Br. at 6–7.)

For the purpose of resolving this motion, the court assumes without deciding that Plaintiffs' speech did play a role in Henry's decision to impose a trustee. But based on the full record, the court holds that no reasonable jury could find that retaliation was the *sole* reason. Put differently, no reasonable jury could conclude that the rationale detailed in Henry's emergency order was exclusively pretextual. As early as August 2015, Brandon accused Boardman—in emails to SEIU leadership—of placing the Local in "serious danger" and claimed the environment at the Local was "hostile." (Brandon Aug. 10, 2015 Email, Ex. EE to DSOF [87-2] at 35.) Less than a week

after that, in another email to Henry, he denounced the "crisis of leadership" at the Local. (Brandon Aug. 14, 2015 Email, Ex. FF to DSOF [87-2] at 37.)

Henry did not appoint a trustee at that point. She chose a less onerous route, appointing two "personal representatives" to help Local 73's leaders solve their issues. (Aug. 18, 2015 Henry Representatives, Ex. K to DSOF [87-1] at 118.) At some point after the representatives arrived, a group of armed union members "burst in" to a Local Executive Board meeting and demanded that Boardman rehire Lindwall, an ally of Brandon's whom Boardman had fired. (Defs.' First Boardman Dep. at 94:13–95:7.) In October 2015, Henry appointed a third personal representative, who sent an auditing firm to review Local 73's books. (Dec. 2015 Letter and Audit Report, Ex. L to DSOF [87-1] at 124–29.) Based on that report, Boardman and Brandon were summoned to SEIU headquarters to discuss "serious management and ethics issues," the "significant work to be done to stabilize Local 73's finances," and other issues—like Boardman and Brandon's personal disputes—that "further threaten the stability of Local 73." (*Id.* at 121–22.)

The last of Henry's personal representatives left the Local in April 2016, writing that he believed Local 73 "has addressed, or has a plan to address, each of the issues raised by SEIU officers." (Howard Apr. 29, 2016 Letter, Ex. W to DSOF [87-1] at 278.) But soon after he left, relations between Boardman and Brandon again deteriorated when Boardman terminated Lindwall a second time and removed Boardman's wife from her staff position. (DSOF ¶¶ 51–52.) That prompted Boardman's wife to file charges with SEIU alleging that Boardman retaliated against her. (Webster-Brandon Charge, Ex. O to DSOF [87-1] at 150.)

Just a few weeks later, on July 1, 2016, Boardman filed her own set of charges against Brandon, alleging a slew of misconduct over 57 paragraphs and eight counts. (DSOF ¶ 25; Boardman First Set of Charges 135–144; *see also* Background § V, *supra* (detailing charges).) She also suspended Brandon from the Local for 30 days and barred him from its offices. (DSOF ¶ 26.) The tension between the two was apparently significant enough that Boardman foresaw the possibility of violence at the Local 73 Executive Board meeting two weeks later and hired off-

duty police officers to attend.  (*Id.* ¶¶ 27–28.)  As Boardman suspected, Brandon ignored his suspension, showed up at that meeting, and asserted that he was the rightful president of the Local given Boardman's previously announced retirement.[20]  (*Id.* ¶ 29.)  Boardman told him to leave, but, according to Boardman, Brandon "attempted to seize control of Local 73 in what can only be described as a coup d'etat."  (Boardman Second Set of Charges at 161.)

According to Boardman's own charges, she concluded that neither she nor the off-duty police at the scene could remove various disruptive individuals "without violence possibly erupting."  (*Id.* at 162–63.)  Despite Boardman's "repeated attempts" to restore order, a group of Brandon's supporters continued to shout "for more than half an hour," such that the Board was unable to proceed with the meeting.  *Id.*  Boardman concluded that the only reasonable decision was to "end the effort to conduct business and adjourn the meeting."  (*Id.* 163–64.)  Even then, Brandon's supporters refused to leave, and the off-duty officers "bec[a]me concerned enough" that they called for on-duty backup.  (*Id.*)

The facts of the meeting are undisputed.  Indeed, they largely come from Boardman's own report.  The Local 73 Record Secretary's later testimony supports Boardman's contemporaneous account.  She testified that the meeting "dissolved into utter chaos," that it was "very chaotic, very chaotic," and that "people [were] yelling and screaming so much" that there was "no control of the meeting."  (Emergency Trusteeship Hearing Tr. at 68.)

Plaintiffs now "dispute that the meeting was utter chaos" (PSOAF ¶ 30) and present an affidavit from a meeting attendee that only five or six people "were verbally disruptive."  (Ziyad Decl., Ex. C to PSOAF [94-1] ¶¶ 3, 5–6.)  But even if there were no "physical threats or physical

---

[20]    The court acknowledges (but need not resolve) the dispute about whether Boardman was clear that she would only retire once she received her foreign birth certificate and/or whether she renounced that decision following Brandon's alleged malfeasance, as Plaintiffs claim.  (*See generally* Background § III, *supra* (detailing Boardman's announcements); DSOFR ¶ 101 (describing Plaintiffs' position and Defendants' response).)  The undisputed fact is that there was a controversy over Boardman's retirement that—along with the charges Boardman brought against Brandon—affected the Local's ability to conduct business.

violence," (*id.* ¶ 6), Boardman's contemporaneous statements to SEIU—the entity which ultimately decided to impose a trustee—tell a different story. Boardman does not dispute that, at the time, she called it a "coup," that some number of Brandon's supporters disrupted the meeting, that police were called, and that the meeting ultimately had to be called off. Indeed, Brandon and his supporters' actions were apparently so troubling that Boardman prospectively cancelled the general members meeting the next day because she did not believe they could conduct business and because "violence might erupt." (Boardman Second Set of Charges at 164.)

Plaintiffs now nevertheless characterize Defendants' governance concerns as mere pretext. (*See* Pls.' Opp. at 9–11.) According to Plaintiffs, Defendants "rush[ed] to judgment" with "insufficient information," which suggests "only one interest"—*i.e.*, removing Boardman from office. (*Id.* at 9.) Plaintiffs say that "no one, not a single person" from SEIU reached out to Boardman to "obtain her account." (*Id.*) But SEIU already knew Boardman's account. In her charges against Brandon, Boardman had described Brandon's "coup" in great detail. (Boardman First Set of Charges 135–144; *see* Background § V, *supra*.)

Plaintiffs' current assertion that Brandon's "attempted disruption was limited to only a few participants" and "the business of the Local continued unabated and without impact following the July 15, 2016 meeting" (Pls.' Opp. at 9) is plainly inconsistent with the record. The undisputed facts show that the disruption was not merely "attempted" but successful: Boardman called off both the Executive Board meeting and the general membership meeting. Plaintiffs themselves recognize as much, however they now characterize it. (*Id.* (referring to the July 15 and 16 meetings as "postpone[d]" rather than "cancel[ed]").) Though Plaintiffs argue that the "confrontation" at the Executive Board meeting is "not grounds to take away the democratic governance of the Local," they cite no authority for that position. (*Id.* at 10.) If Plaintiffs are implying that Defendants were required to take a "less drastic" step instead of or before imposing a trustee, the Seventh Circuit has rejected that argument. *See Local Lodge 714*, 845 F.3d at 693

35

(concluding that a trustee was "a proper method" for addressing financial malpractice "even if less drastic methods would have sufficed").

Plaintiffs next claim the governance issues were pretext because Boardman and Brandon had worked well together in the past and because their summer 2016 dispute only materialized because of serious misconduct by Brandon. (Pls.' Opp. at 10.) That argument is unpersuasive on the facts and the law. First, as discussed above, the record contains significant evidence of discord between Brandon and Boardman beginning at least as early as August 2015, when Brandon told SEIU leadership the Local was in "serious danger" and had a "crisis of leadership." (Brandon Aug. 10, 2015 Email, Ex. EE to DSOF [87-2] at 35; Brandon Aug. 14, 2015 Email, Ex. FF to DSOF [87-2] at 37.) But second, even if Boardman is right that the dispute between the two only "erupted in June 2016" (Pls.' Opp. at 10)—and even if she is right that the dispute was entirely Brandon's fault—that does not render Defendants' governance concerns pretext. Whoever was to blame for the "utter chaos" at the July 15 meeting (Emergency Trusteeship Hearing Tr. at 68), the fact remains that a group of armed dissenters shut down an Executive Board meeting in what Boardman called a "coup," causing off-duty police at the scene to call for on-duty reinforcements. Any reasonable jury would conclude that Defendants had a legitimate basis for governance concerns.

As Defendants note, a trusteeship—unlike disciplinary proceedings against an individual—aims to remediate issues at a local, not to punish wrongdoers. (Defs.' Br. at 13–14 n.6 (citing DSOF ¶ 11).)[21] In other words, Defendants need not show that Boardman was at fault to justify the trusteeship. Plaintiffs' argument that Boardman rescinded her retirement

---

[21]     Plaintiffs partially dispute Defendants' statement that "[a] trusteeship is not a disciplinary action against the local union's president," responding that while that may be the case generally, it was not "used as a remedial tool in the instant case as it removed the President without any claim of wrongdoing." (*See* PSOAF ¶ 11.) That response begs the question by assuming that a truly "remedial" process would necessarily include wrongdoing when Defendants' point is that it does not. The section of the SEIU Constitution governing trustees provides that a trustee is intended to "protect the interests of the membership"; it does not address misconduct. (SEIU Constitution and Bylaws [87-2] at 117.)

36

announcement because of Brandon's malfeasance (Pls.' Opp. at 10) is irrelevant for the same reason. Whatever caused the dispute, the fact remains that the Local was, in the time leading up to the trusteeship, unable to conduct its business.

In the end, Plaintiffs' claim that Henry's decision to impose a trustee was retaliatory rests on "speculation or conjecture," which this court need not credit. *See Boss*, 816 F.3d at 916. Plaintiffs assert that Henry had long wanted to impose a trustee, and that "[b]ased on past practices, Boardman reasonably suspected the purpose of the Personal Representatives was to provide information to the International that would justify intervention through a trusteeship." (Pls.' Opp. at 11.) But they ignore the factual record about disputes and financial mismanagement that led Henry to impose those representatives (*see* Background § II, *supra*) and only cite Boardman's declaration to support their assertion. (Pls.' Opp. at 11.) Even then, Plaintiffs fail to cite any specific paragraph backing up Boardman's suspicions. (*Id.*)

The inference Plaintiffs request this court draw is particularly unreasonable because of the timing: The record shows that the chaos at the July 15 meeting was the impetus for the trusteeship and that Henry appointed a trustee at least in part on the advice of her subordinates. The trustee process was set in motion by a memo dated July 18, 2016—the Monday following the aborted Friday meeting—from Michelle Healy to Heather Conroy, neither of whom are Defendants in this action or alleged to have any animus toward Plaintiffs. (July 18, 2016 Mem. from Michelle Healy to Heather Conroy, Ex. KK to DSOF [87-2] at 54.) That memo detailed the "quickly deteriorating" conditions at Local 73 and raised the possibility of a trusteeship. (*Id.*) About two weeks later, Deedee Fitzpatrick, Henry's Deputy Chief of Staff, wrote a memo to Henry advocating for an emergency trustee for essentially the reasons Henry later stated in her order. (*Compare* Aug. 1, 2016 Fitzpatrick Mem. at 70–72 *with* Aug. 3, 2016 Trusteeship Order at 6–9; *see also* Background § VII, *supra*.)

Henry testified that she relied on Fitzpatrick's recommendation (Defs.' First Henry Dep. at 55:12–14), and Fitzpatrick averred that she did not know about, nor was she motivated by

Boardman's past criticisms of Henry and SEIU. (Fitzpatrick Decl. ¶¶ 40–41.) Though Plaintiffs contest the accuracy of those memos—*i.e.*, that there was, in fact, a breakdown of governance or that the July 15 meeting was, in fact, chaotic—they do not contest that Healy and Fitzpatrick sent them. (*See* PSOAF ¶¶ 14–15.) And while Plaintiffs claim Fitzpatrick's affidavit is "self-serving," they do not cite any evidence suggesting her statements about her knowledge or motivations are untrue or incorrect. (*Id.* ¶ 71); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (reasoning that affidavits and other written statements "by their nature are self-serving" and are admissible at summary judgment).

The court notes, further, that the evidence supporting Plaintiffs' retaliation theory is weak. Whereas the trustee came on the heels of the "chaos" at the Local 73 Executive Board meeting, Boardman's statements that allegedly spurred Henry to retaliate were made many months or even years earlier. The most significant anti-Henry position that Boardman took—supporting Henry's opponent for SEIU president—was in 2010, six years before Henry appointed a trustee. (*See* Background § I.A, *supra*.) Boardman's unsuccessful efforts to organize the Illinois Nurses Association and Cook County FQHC facilities took place back in 2012 and 2014, respectively, and appear to be minor spats in retrospect. (*See* Background § I.C–D, *supra*.) Finally, Boardman opposed SEIU's decision to endorse Hillary Clinton in late 2015—the closest action in time to the August 2016 trusteeship—but there is no evidence that Henry even knew about Boardman's opposition, much less that it motivated her to appoint a trustee. (*See* Background § E, *supra*.) "Assuming for the sake of argument" that Henry knew about Boardman's past speech, the very long break between the speech and Henry's purported retaliation "seems to undercut any inference" that Henry was motivated by Boardman's speech. *See Kelly v. Municipal Courts*, 97 F.3d 902, 912 (7th Cir. 1996) (four-month delay between speech and termination undercut inference of retaliation).[22]

---

[22]  Plaintiffs attempt to distinguish *Kelly*'s logic by arguing that, because Boardman was an elected official, Defendants could not retaliate as quickly as they otherwise would have.

Plaintiffs also detail what they believe are Defendants' failures to follow proper procedures after imposing the trustee. (*See* Pls.' Opp. at 5–9.) For example, Plaintiffs criticize the choice to appoint an emergency trustee, which, unlike a normal trustee, does not require a pre-imposition hearing. (*Id.* at 6.) They also argue that Defendants "dragged their feet" in scheduling the emergency trustee hearing, which is supposed to be held within thirty days absent good cause. (*Id.* at 6–7.) Once SEIU held the hearing, Plaintiffs assert that SEIU improperly denied Boardman "party status," which would have allowed her to call and cross-examine witnesses. (*Id.* at 7–8.) After the hearing, Plaintiffs claim the IEB failed to ratify the decision within the time period required. (*Id.* at 8.) According to Plaintiffs, Henry thereafter denied Boardman the chance to "present her appeal" and dissent from the Hearing Officer's recommendations. (*Id.*) Defendants, not surprisingly, take issue with nearly every factual assertion embedded in Plaintiffs' narrative.[23] (*See* Defs. Reply at 2–7.)

But Plaintiffs offer no evidence that they were "treated differently from similarly situated union members who did not exercise their right to free speech." *Serafinn v. Local 722, Int'l Bhd. of Teamsters*, 597 F.3d 908, 918 (7th Cir. 2010). Plaintiffs answered "admit" to Defendants' Statement of Fact that "no president of a local union that was trusteed for reasons related to the internal operations of the local has been retained on staff of the local during Henry's presidency" nor "at any time in recent history" that SEIU could identify. (*See* PSOAF ¶ 56.) Plaintiffs do assert

---

(*See* Pls.' Opp. at 13.) But that ignores the many other incidents—like those that prompted Henry to appoint personal representatives—that Defendants could have used as pretext to impose a trusteeship, had they wished to retaliate earlier. True, "the passage of time is not dispositive" as to causation. *See Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017) (cited in Pls.' Opp. at 13). But as discussed elsewhere in this opinion, Plaintiffs have not offered the kind of strong evidence required to support an inference of delayed retaliation. *Id.* (reversing summary judgment where plaintiff provided testimony and a "good deal of other circumstantial evidence").

[23]     The court notes for completeness that Boardman has never specified what witnesses she would have presented, what testimony she would have sought to draw out on direct or cross-examination, or what she would have argued had she been permitted to "present her appeal." Boardman did not even use the full thirty minutes provided to her at the hearing, although the hearing officer told her he would allow her extra time, if she needed it. (*See* Trusteeship Hearing Tr., Ex. UUU to DSOFR [98-1] at 124:18-28, 127:28-141:19 (showing start of Boardman's statement at approximately 2:36 p.m. and end at approximately 3:00 p.m.).)

that Henry's August 3 trusteeship at Local 73 was the "one and only time Defendants acknowledge use of the emergency provisions of its constitution" during Henry's entire presidency. (Pls.' Opp. at 6.) But they misstate the record. Defendants have submitted (unrefuted) evidence that Henry imposed at least four other emergency trusteeships on other locals, including one before August 3, 2016. (*See* Henderson Decl. ¶¶ 6–7.)

In any event, the court need not resolve the minutiae of Plaintiffs' assertions about procedural irregularities because they are not material. Under the governing standard, if Defendants had "at least one proper purpose" for imposing a trustee, "the Court need not consider Plaintiffs' allegations of additional improper motives"—*i.e.*, animus toward Boardman. *Keenan v. Int'l Ass'n of Machinists*, 632 F. Supp. 2d 63, 70 (D. Me. 2009) (internal quotation marks omitted); *see also Utility Workers United Assoc., Local 537 v. Utility Workers' Union of Am.*, No. 19-cv-1077, 2022 WL 254389, at *7 (W.D. Pa. Jan. 27, 2022) ("[T]he presence of an improper purpose is not fatal to the validity of a trusteeship so long as there is at least one proper purpose.")

Plaintiffs argue that Defendants' "[d]eviation" from their "normal practices and procedures is competent evidence of wrongful motive and intent" (Pls. Opp. at 8–9 (citing cases)), but such deviations do not show that the Defendants *sole* motive for imposing the trustee was retaliation. *See Local No. 87*, 230 F. Supp. 2d at 1105 (existence of impermissible motive is immaterial if trusteeship is supported by at least one proper purpose). Put differently, "in order to survive summary judgment, plaintiffs must raise a dispute as to *each* purpose SEIU has put forward to justify the trusteeship." *Id.* (emphasis added). Accepting Plaintiffs' procedural complaints as some evidence of pretext still does not create a dispute about the chaos at the cancelled July 15 and 16 meetings, which Henry cited in her emergency order. (Henry Aug. 3, 2016 Order at 6.) So even if the court were to credit those procedural irregularities—and find they were on account of Boardman's speech—no reasonable jury could conclude that those irregularities show that Defendants' sole purpose was retaliatory.

In sum, Plaintiffs have not adduced "evidence that would reasonably permit the finder of fact to find in [their] favor" on the only material question: whether Defendants had a single non-pretextual reason for imposing a trustee. *Modrowski*, 712 F.3d at 1167. Resolving all disputes and drawing all reasonable inferences in Plaintiffs' favor, there is no evidence that Defendants' concerns about governance were solely pretextual. Accordingly, the court grants summary judgment on the Title III claims. *See Local No. 87*, 230 F. Supp. 2d at 1105 (defendants are "entitled to summary judgment as long as one of [their] rationales for imposing the trusteeship was proper, assuming plaintiffs cannot create a triable issue of fact as to the existence of that purpose").

**B.    Plaintiffs' Remaining Claims Fail Because the Trusteeship Was Proper.**

Because the court holds that the trusteeship was proper under Title III, and Plaintiffs' other claims all derive from the assertion that the trusteeship was improper, the court must grant summary judgment on those claims, too.

Plaintiffs assert several claims under LMRDA Title I, Section 101(a)(2), which provides that members of labor unions "shall have the right to meet and assemble freely with other members" and "to express any views, arguments, or opinions." 29 U.S.C. § 411(a)(2); (*see also* Second Am. Compl. ¶¶ 43–50, 78–88 (pleading claims under same)). This court previously held that Title I protects against removal from elected office in retaliation for speech, and because Plaintiffs had adequately alleged that "Defendants imposed the trusteeship solely in retaliation for their speech," the court denied Defendants' motion to dismiss. *See Boardman*, 441 F. Supp. 3d at 675 (citing *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 356 (1989)). In the end, "Plaintiffs' argument that the imposition of the trusteeship violated their rights of free speech under the LMRDA Bill of Rights is really just another way of saying that the trusteeship was invalid because it was imposed for an improper motive." *Morris*, 2001 WL 1231741, at *10. But now, having found that the trustee was "lawful under Title III," the court concludes that Plaintiffs' injury—

the loss of their elected offices—"cannot ground a proper Title I claim."  *See Keenan*, 632 F. Supp. 2d at 72.

The same is true for Plaintiffs' claims that they were stripped of their union *membership* because of their speech.  (*See* Second Am. Compl. ¶¶ 50, 88.)  The court previously held that Plaintiffs stated a claim "for the resulting loss of their union membership" when they were terminated from elected positions in retaliation for their speech.  *Boardman*, 441 F. Supp. 3d at 679 (citing *Brunt v. Service Emps. Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002)).  Because the court today holds that those terminations were lawful, the resulting effect on Plaintiffs' membership is, too.[24]  Defendants' lawful termination of Plaintiffs' union membership also renders Plaintiffs' Section 101(a)(5) due process claims meritless. *See Brunt*, 284 F.3d at 719–20.

Finally, the court grants summary judgment in favor of Defendants on Boardman's remaining two claims, both of which rely on the assumption that she was improperly excluded from a February 23, 2019 meeting.  Because Boardman was no longer a union member as of February 23, 2019—and the court has determined that Defendants properly terminated her membership—she has no claim under Section 101(a)(2).  Boardman's other claim under 29 U.S.C. § 411(a)(4) applies only to "member[s] of a labor organization," which Boardman was not at the time she alleges Defendants retaliated against her.  Though Boardman insists that she was a retiree and should have been admitted to the meeting on that basis, she cites no evidence for that assertion.  (*See* Pls.' Opp. at 14–15.)  Defendants, on the other hand, cite a declaration of co-trustee Palmer that Boardman never retired, but instead was "removed from her employment with the imposition of the trusteeship" and was therefore not a retiree.  (*See* Palmer Decl. ¶ 12

---

[24]    Barnett's union membership was not terminated at the time the trustee was imposed and she lost her elected office.  It was terminated later, when she was fired from her staff position. (Second Am. Compl. ¶¶ 78-88.)  Because the court previously dismissed Barnett's claim arising from her staff termination, *Boardman*, 441 F. Supp. 3d at 676-77, her only claim remaining at this stage is that she would not have lost her membership had she retained her elected office.  But that argument fails because the trusteeship was valid and so was her removal from office.

(cited at DSOF ¶ 75); *see also* Background § XI, *supra* (describing lack of contrary evidence cited by Plaintiffs).) Boardman has not shown a dispute of fact about whether she was a union member when she tried to attend the February 23, 2019 meeting, and the court accordingly grants summary judgment.

## CONCLUSION

For the reasons discussed above, the court grants Defendants' motion for summary judgment [85]. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiffs. Civil case terminated.

ENTER:

Dated:  September 30, 2022

_____
REBECCA R. PALLMEYER
United States District Judge